## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Robert A. Anderson,                                Case No. 20-cv-1147 (KMM/LIB)

          Plaintiff,

v.

William Vanden Avond, acting in his
individual capacity as a Morrison
County Sheriff's Deputy,

          Defendant.

**ORDER ON MOTION FOR
SUMMARY JUDGMENT**

 

This action arises out of Officer William Vanden Avond firing a less-lethal "beanbag" round while arresting Robert A. Anderson for domestic assault. The lead-filled projectile penetrated Mr. Anderson's chest, causing life-threatening injuries. Mr. Anderson brought this 42 U.S.C. § 1983 action against Officer Vanden Avond for use of excessive force in violation of his Fourth and Fourteenth Amendment rights. Before the Court is Officer Vanden Avond's motion for summary judgment asserting qualified immunity.[1] [ECF No. 31]. For the reasons discussed below, the motion is **DENIED**.

---

[1] On February 8, 2022, the parties filed a joint stipulation to dismiss Mr. Anderson's second cause of action for failure to train. [ECF No. 49]. The Court granted this request and dismissed Count II on February 9, 2022. [ECF No. 51]. Accordingly, the Court only addresses Count I in this order.

## I.     BACKGROUND

In the late afternoon on May 22, 2019, Morrison County Police Deputy William Vanden Avond drove to Genola, Minnesota to respond to a report of domestic assault. Jenna Doble met him at her residence. She informed the officer that her ex-boyfriend, Robert Anderson, physically assaulted her and threatened to kill himself before fleeing the house in a tan Buick. Over text and during a phone call with Ms. Doble and Officer Vanden Avond, Mr. Anderson repeated his suicidal ideations, insulted the officer, and stated that he had a gun. [*Id.* 16:32:37–52]. After Mr. Anderson hung up, Ms. Doble told the officer that she did not believe he had a gun, but that he likely had a knife. [Pl. Ex. 20 at Morrison 957]. This information was also relayed to other officers. Officer Vanden Avond specifically conveyed Ms. Double's doubt that Mr. Anderson had a gun. [Dzieweczynki Dep., at 18:9–12].

### Confrontation in the Field

While Ms. Doble spoke with Officer Vanden Avond, Pierz Police Officer Calvin Tschida found tire tracks leading to Mr. Anderson's car in a swampy, recently plowed field. He radioed dispatch, and Officer Vanden Avond, Morrison County officers Sheriff Shawn Larsen, Sergeant Doug Rekstad and Deputy Mark Dzieweczynki, State Patrol trooper Matt Anderson, DNR officers Annette Kyllo and Keith Bertram, and Little Falls officers Sergeant John Ruby and Officer Eric Hegna responded. [Compl. ¶¶ 25–26].

2

Officer Vanden Avond provided video footage of the entire incident in the field taken by a squad car. [Worlie Decl. Ex. 2, ECF No. 34-2]. The footage shows the inebriated and suicidal Mr. Anderson leaning out of the window of his tan Buick as the police approached his vehicle. [*Id.* at 17:08:40–43]. The officers began yelling commands at Mr. Anderson, telling him to show his hands. [*Id.* at 17:08:49]. Mr. Anderson showed his hands, but when the officers ordered him to "get out of the car," he did not leave his vehicle. [*Id.* at 17:08:49]. When asked again, Mr. Anderson again appears to lean out the window of his car. [*Id.* at 17:08:53]. One officer can be heard saying "He's drunk" as the police vehicles move closer to Mr. Anderson. [*Id.* at 17:09:00].

As the officers approached in their vehicles, Mr. Anderson leaned back inside his car and his hands were no longer visible. [*Id.* at 17:09:03]. The officers yelled at him to "keep [his] hands out the window" three times, but Mr. Anderson did not show his hands, and said something incomprehensible to the officers. [*Id.* at 17:09:03–9:07].

Five law enforcement officers, including Officer Vanden Avond, advanced slowly on foot towards Mr. Anderson, and continued to command him to keep his hands up and out of the window. [*Id.* at 17:09:17]. Other than Officer Vanden Avond, each of the officers was armed with a regular firearm. Officer Vanden Avond carried a less-lethal shotgun loaded with "beanbag" rounds. An officer then ordered Mr. Anderson to open the door and shouted at him to "try." [*Id.* at 17:09:19]. While it is unclear if Mr. Anderson attempted to open the door, he remained in the vehicle.

Mr. Anderson then called out that he was "grabbing a cigarette" and ducked into his car, as the officers shouted at him not to and to get his hands up. [*Id.* at 17:09:25–9:26]. One of his hands was visible the entire time, and footage appears to show that he lifted both up again within seconds of the command. [*Id.* at 17:09:28]. The officers ordered him to open the door, as both of his hands were visible on the outside of the car. [*Id.* at 17:09:38]. He leaned inside the car again. [*Id.* at 17:09:45]. When he emerged, the officers ordered him to open the door, and that he can have his cigarette outside. [*Id.* at 17:09:51]. Mr. Anderson retorted that they will not let him have it. [*Id.* at 17:09:53]. As he argued with the officers, Mr. Anderson leaned further out of the window, and then said "I have a gun" two times, though his hands were showing and empty. [*Id.* at 17:10:01–10:02]. When the officers told him to get out of the car, he said "No. I don't want to go back." [*Id.* at 17:10:04–10:05]. He continued to verbally refuse commands to leave his vehicle and became increasingly agitated, hanging much of his torso outside of the car window and banging on the side. [*Id.* at 17:10:05–10:18].

The footage shows that roughly nine seconds before Mr. Anderson was shot, he pushed his torso out of the window and spread his arms while he leaned forward.[2] [*Id.* at 17:10:41]. He was silent, keeping his empty hands visible while he leaned forward out of

---

[2] The Court bases the use of "roughly nine seconds" on its own review of the video, and its own estimate. The precise length of time may be in some dispute, and would ultimately need to be resolved by a finder of fact.

the window. During those nine seconds, Officer Vanden Avond slowly knelt, aimed, and fired his less-lethal shotgun. The beanbag hit Mr. Anderson and he collapsed into his car. The lead-filled round had punched a hole Mr. Anderson's upper chest, causing a severe wound, fracturing his sternum, collapsing his right lung, and lacerating his liver. According to medical reports from the Hennepin County Medical Center, Mr. Anderson had a "high probability of imminent life or limb-threatening deterioration due to penetrating chest trauma." [Noel Decl. Ex 29, ECF No. 46-29].

There is a significant dispute about how far away Officer Vanden Avond was from Mr. Anderson at the time he fired the round. Officer Rekstad testified that, shortly after the shooting, he and Officer Vanden Avond measured the distance between where he believed he shot and the vehicle as 43.6 feet, and the distance between the discharged casing and the vehicle as 19 feet, but the written measurement data was lost before it was entered into evidence. [Vanden Avond Dep. 109:16–23; Rekstad Dep. 64:19–65:4; 72:4–13]. During his deposition, Officer Vanden Avond estimated the distance to be around 25 to 30 feet, testifying that he fired from the line between the dirt and the grass. [Vanden Avond Dep. 45:7–9]. Mr. Anderson provided an estimate as well, guessing that about 12 to 15 feet separated him and the officer. [Anderson Dep. 52:22–53:4]. The video footage shows that when Officer Vanden Avond fired, he was into the grassy area, well past the dirt line referred to by Officer Vanden Avond, and down a slight slope. [Video 17:10:41].

Mr. Anderson's expert, John J. Ryan, also reviewed the video and estimated the distance as 17.5 feet. [Ryan Decl. ¶ 195, ECF No. 46-26].

### The Less-Lethal Weapon

Officer Vanden Avond used a weapon that is classified as a "less-lethal" shotgun. It was a "Winchester Model 1200, serial number L571688, U.S. Military Surplus, with a 2 ¾ chamber and a cylinder bore barrel fitted with a heat shield and rifle sights. The stock and forend had been painted orange to designate it as an LTL only shotgun." [Expert Report of Michael Shain at 4, ECF No. 37-10].

The specific round used by Officer Vanden Avond is advertised as "the Law Enforcement Communities' number one choice for Specialty Impact Munitions to be used as a dynamic, high energy, single target round for incapacitation or the distraction of a non-compliant, aggressive subject." [*See* Specification Sheets – 12G at 127, ECF No. 46-12]. It is "most successful in incapacitation" within the range of 20–50 feet. [*Id.*]

The specifications and training for these rounds have no shortage of warnings. The right side of the specifications page, contains a warning in bold, capital letters: "this product may cause serious injury or death to you or others." [*Id.*] The specifications repeatedly offer instructions to "minimize serious or life-threatening injuries." [*Id.*] These include deploying an accurate round, taking into account "level of threat, target distance, size, and clothing," and aiming at "large muscle groups" such as the "buttocks, thigh, and even the knee." [*Id.*]

These warnings about placement are reiterated in the training. [Safariland Instructor Course Program, Specialty Impact Munitions at 42–49, ECF No. 46-12]. The training explicitly discusses the two types of trauma caused by beanbag rounds: blunt force trauma and penetrating trauma. [*See* Safariland Advanced Training Instructors Guide at 14–22 (showing images of bruising from impact munition and a beanbag embedded in an individual's body)]. It explicitly warns that these impact munitions may cause "penetrating trauma" which "may result from a combination of the following: excessive kinetic energy, determined by the weight, size, shape, and velocity of the projectile; target distance; subject's physical stature, shot placement, and clothing." [*Id.*]

According to the Morrison County officers, less-lethal shot placement at high-risk areas of the body requires authorization for the use of deadly force.[3] [*See* Vanden Avond

---

[3] Deadly force to the Morrison County Sheriff's Office is "that force actually used by a deputy who knows, or reasonably should know, creates a risk of causing death or great bodily harm." [Morrison County Sheriff's Office's Policy and Procedure Manual, § 6.21, ECF No. 46-36]. It is justified to protect other officers or other people from "apparent death or great bodily harm" and to arrest, capture, or prevent escape of an individual that the officer reasonably believes has committed or attempted a felony involving the use or threatened use of deadly force, or any felony if the officer reasonably believes that the individual would use deadly force if their capture is delayed. [*Id.* at 2]. Non-deadly force is all force not included in deadly force. It is authorized to protect themselves or others from physical harm, effectuate an arrest or legal process, or carry out any other duty imposed by law. [*Id.* at 3]. To determine where a use of force falls, Morrison County has a "force continuum" which is "a graduating list of force options designed to give deputies guidance in deciding how much force to use." [*Id.* at 2]. "Less Lethal Projectiles" are classified in the same category as K9 apprehensions, as "impact weapons." [*Id.* at 3].

Dep. at 22; King Dep. 37:6–19; Rekstad Dep. 20:4–8; Prince Dep. 13:2; Larsen Dep. 46:11–13].

**Zones of Impact**

Police officers in Morrison County trained in the use of beanbag shotguns are taught to consider the body of a target as having three Zones. Zone 1 constitutes the legs and has the lowest potential for serious injury. [Instructor Course Program, Specialty Impact Munitions, at 46]. This is because "it has the greatest amount of muscle mass and the least number of vital organs." [*Id.*] But there is a significant dispute over which areas make up the other two zones. It is generally accepted that Zone 2 has a "greater potential for causing serious injury when struck" and at least encompasses the stomach and hip area of the abdomen. [*Id.* at 47]. It is also accepted that the head, neck, and heart area are in Zone 3. [*Id.* at 48]. Training materials state that officers must not aim in this area "unless deadly force can be justified." [*Id.*]

Yet the lines between Zone 2 and Zone 3 blur around the diaphragm and ribcage. And in this case, the training materials and officer testimony are inconsistent about where the mid-chest, lower-chest, and diaphragm fall within the two zones. The training materials identify the chest area or the center of mass as Zone 3. Officer Rekstad identifies Zone 3 in his deposition as "roughly the nipple line up," [Rekstad Dep. at 22:11–12], then states that it probably goes below the nipple line. [*Id.* 23:14–15]. In his deposition, Minnesota Bureau of Criminal Apprehension Special Agent Nicholas Riba, who was in

charge of the investigation into Officer Vanden Avond's use of force, testified that Zone 3 is "around the heart." [Riba Dep. 42:4–9, ECF No. 37–9]. The individual who trained Officer Vanden Avond, Investigator Casey King, stated in his deposition that he believes that it has always been "open to interpretation" on exactly which Zone the chest is in. [King Dep. 36:2–8, ECF No. 37–12]. Officer Vanden Avond provides the most variety. He testified that it includes: the chest area [Vanden Avond Dep. 22:5–12]; "between the armpits . . . down to the bottom of the rib cage" [*Id.* at 57:22–58:4]; "lower chest" [*Id.* at 87:7–9]; "the sternum notch up" [ *Id.* at 134:7–8]; not the solar plexus [*Id.* at 134:3–4].

## II.   ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper where "no genuine dispute as to any material fact [exists] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are only those "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute if a reasonable jury could find in favor of the nonmovant. *Id.* Where there is a factual dispute, those facts should be viewed in the light most favorable to the non-moving party. *E.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.

**B.  Qualified Immunity and Excessive Force**

Mr. Anderson asserts a § 1983 excessive force claim against Officer Vanden Avond in his individual capacity. The officer brought this motion to challenge the excessive force claim, and alternatively, assert the affirmative defense of qualified immunity.

Qualified immunity protects public officials from suit "unless their conduct violates a clearly established right of which a reasonable official would have known." *Burnikel v. Fong*, 886 F.3d 706, 709 (8th Cir. 2018). Whether qualified immunity is applicable in a given circumstance is a question of law. *Moore v. Indehar*, 514 F.3d 756, 764 (8th Cir. 2008). A court must deny a summary judgment motion based on qualified immunity if: "(1) the evidence, viewed in the light most favorable to [the non-movant], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable offic[er] would have known that his actions were unlawful." *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014). However, if either of those factors cannot be established, qualified immunity applies and the motion should be granted.

The constitutional right at issue here is Mr. Anderson's Fourth Amendment right to be free from unreasonable seizure. *Graham v. Connor,* 490 U.S. 386, 396 (1989). Use of force during an arrest is permissible where "the amount of force used was objectively reasonable under the particular circumstances." *Thompson v. Monticello*, 894 F.3d 993, 998 (8th Cir. 2018) (quoting *Coker v. Ark. State Police*, 734 F.3d 838, 842 (8th Cir. 2013)). This

"requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The reasonableness of an officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* It must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

At summary judgment, the plaintiff bears the burden to "present evidence from which a reasonable jury could find the defendant officer has violated the plaintiff's constitutional rights." *Id.* However, "[w]here the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate." *Banks v. Hawkins*, 999 F.3d 521, 525 (8th Cir. 2021), *cert. denied*, No. 21-770, 2022 WL 1295711 (U.S. May 2, 2022). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

### C.  Deadly Force

At the outset, the Court notes that this case, and the parties' framing of the issues, present a challenging question about the analytical framework that must be applied. Much of the attention in the briefing has been placed on whether Officer Vanden Avond's

firing of the beanbag was a justifiable use of deadly force. Here, the parties agree that for the purposes of an excessive-force claim, deadly force is "such force that creates a substantial risk of causing death or serious bodily harm." *Church v. Anderson*, 249 F. Supp. 3d 963, 968 (N.D. Iowa 2017), *aff'd* 898 F.3d 830 (8th Cir. 2018) (quoting *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009)); *accord Mattis v. Schnarr*, 547 F.2d 1007, 1009 n.2 (8th Cir. 1976) (en banc), *vacated as moot sub nom.*, *Ashcroft v. Mattis*, 431 U.S. 171 (1977) ("'[D]eadly force' means force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm.").[4] The parties also agree, consistent with Eighth Circuit law, that in use-of-deadly-force cases there are certain considerations that are "particularly relevant . . . to guide our assessment of objective reasonableness." *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020). In such cases, "absent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable." *Id.* (quotation marks omitted); *Thompson v. Dill*, 930 F.3d 1008, 1013 (8th Cir. 2019) (providing that seizure by deadly force is constitutional only if the totality of the circumstances gives the officer "probable cause to

---

[4] Although this standard reflects a consensus among the Circuit Courts, *see, e.g.*, *In re City of Philadelphia Litig.*, 49 F.3d 945, 966 (3rd Cir. 1995); *Timpa v. Dillard*, 20 F.4th 1020, 1032 (5th Cir. 2021); *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988); *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Bradley v. Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021), and the district courts in the Eighth Circuit, the Eighth Circuit itself has not explicitly adopted a standard for what constitutes deadly force since *Mattis*.

believe that the [arrestee] poses a threat of serious physical harm, either to the officer or others").

The harmony between the parties regarding the applicable legal framework ends there. After he acknowledges the principles governing use-of-deadly force cases, Officer Vanden Avond asserts that the deadly-force analysis is inapplicable in this case because he did not use deadly force. He insists this cannot be a case involving the use of deadly force because he aimed the beanbag shotgun at Mr. Anderson's mid-section, which is consistent with his department's approach to non-lethal use of the weapon. [ECF No. 33 at 14–16]. Quite to the contrary, Mr. Anderson asserts that Officer Vanden Avond's initial premise is an attempt to "lead the Court astray." To support his own insistence that this case must be analyzed under the deadly-force framework, he points to evidence including Officer Vanden Avond's testimony regarding where he aimed the shotgun, the fact that the beanbag hit Mr. Anderson in the chest, testing of the shotgun's accuracy, the distance from which the weapon was fired, and details from the squad video. [ECF No. 45 at 47–50].

In the typical deadly-force case, a similar dispute is nowhere to be found because the officer's conduct usually involves shooting a traditional, lethal firearm at a suspect, an action which inarguably constitutes the use of deadly force. This is not the typical case. Unfortunately, because the parties analyzed this case in such different ways, their briefs

do not point to cases illustrating precisely how this foundational disagreement must be resolved on a motion for summary judgment addressing a defense of qualified immunity.

So who is right? Officer Vanden Avond, who claims no reference to the deadly-force caselaw is appropriate, or Mr. Anderson, who insists Officer Vanden Avond's conduct must be analyzed by reference to such precedent? It is not entirely clear that the Court must determine, at the summary judgment stage, whether Mr. Anderson's Fourth Amendment excessive force claim is one involving either the use deadly or non-lethal force. After all, the Supreme Court has admonished that there is no "magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott*, 550 U.S. at 382. Rather, in all excessive-force cases, whether involving the use of deadly force or otherwise, the constitutional question is ultimately judged by the standard of objective reasonableness. *Id.* (explaining that even when deadly force is present, the analysis is "simply an application of the Fourth Amendment's 'reasonableness' test . . . to the use of a particular type of force in a particular situation"). Though the Eighth Circuit has articulated considerations that are especially important in cases considering the use of deadly force, its own decisions similarly focus on objective reasonableness. *See Cole*, 959 F.3d at 1132 ("The test for whether force is excessive asks whether the amount of force used was objectively reasonable under the particular circumstances. . . . Although we consider the totality of the circumstances, . . . our use-of-deadly-force cases have identified a few considerations particularly relevant here to

guide our assessment of objective reasonableness.") (internal quotations and citations omitted).

Despite the challenge of this initial question, this Court's survey of the relevant caselaw suggests that where there are disputed facts that could lead a reasonable juror to find an officer's conduct amounted to deadly force, that issue is one for the jury to decide. Further, the Court finds that on this record, there are facts material to that question that are genuinely in dispute. And finally, the Court concludes that deciding Officer Vanden Avond is entitled to summary judgment on his qualified immunity defense would require the Court to resolve those disputed issues of fact, which would not be appropriate.

### 1. Instructive Authority

The Eighth Circuit Court of Appeals has not explicitly addressed how a district court should resolve a disagreement about whether an officer's use of force was "deadly force" on a motion for summary judgment. There are two cases that come close, though they are more instructive than definitive.

The most robust analysis appears in a case involving the use of police canines. *Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007). The *Kuha* court began by highlighting that no court of appeals had ever determined that the use of a police canine was considered deadly force, and that several had expressly concluded otherwise.

*Id.* Pointing to *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir.1988), the *Kuha* court noted that other courts had found the use of police canines could constitute deadly force only where "the unusual circumstances which resulted in the suspect's death were foreseeable" and not "an extreme aberration from the outcome intended or expected." 365 F.3d at 598. Although it did not embrace any particular definition of deadly force, the *Kuha* court found "the likelihood of death from the use of a properly trained police dog to apprehend a suspect sufficiently remote as to preclude its characterization as deadly force." *Id.*

This determination from *Kuha* could be read to imply that whether a particular means—a weapon, a canine, or one's own hands—of imparting force upon a suspect to apprehend him or her constitutes deadly force is an issue of law for a court to decide. But there are reasons to refrain from drawing such a conclusion.[5] For one thing, *Kuha*'s relevance to this case is somewhat limited due to the differing nature of police canines and beanbag projectiles. The properly trained police canine described in *Kuha* is only deadly in circumstances that are an "extreme aberration" from the norm. *Kuha*, 365 F.3d at 598 (quoting *Robinette*, 854 F.2d at 912). In contrast, as evidenced in their depositions, officers in Morrison County may use beanbag shotguns to employ deadly force so long

---

[5] It would make little sense to read *Kuha* to mean, for example, that were an officer to use a properly trained police dog to apprehend a particularly young or vulnerable suspect for whom the risk of death or serious bodily injury may be significantly greater, such a deployment of the canine could not be characterized as deadly force.

as they have deadly force authorization, and they are trained that use of such a weapon can constitute deadly force. While it is not the primary purpose of a beanbag shotgun, the fact that the county has a policy authorizing their use for deadly force indicates that it is not the "extreme aberration" described in *Kuha,* but a foreseeable occurrence. The label "less-lethal weapon" itself implies that while beanbag shotguns are not *designed* to cause lethal harm, they are still more likely to cause serious injury or death than other "non-lethal" weapons, such as stun guns or pepper spray. *See Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) ("Although bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal' weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death . . . if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or groin.") (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001)). Given these differences, this Court is satisfied that *Kuha* does not preclude a finding that certain uses of beanbag rounds can be classified as deadly force.

The Eighth Circuit's other exploration of the use of something other than a traditional firearm in a manner that might constitute deadly force was in 1995, when it stated that "an attempt to hit an individual with a moving squad car is an attempt to apprehend by use of deadly force." *Ludwig v. Anderson*, 54 F.3d 465, 473 (8th Cir. 1995). Having stated this conclusion, the *Ludwig* court found that issues of material fact precluded it from determining whether the officer's operation of the vehicle amounted

to deadly force or resolving the claim that it did on summary judgment. If the car was "almost stopped" and the officer was "using it solely as a barricade," the *Ludwig* court stated, the force was reasonable, and presumably not deadly. *Id.* But if the squad car was "moving 15 miles per hour" and acting as a battering ram, as the plaintiff alleged, the force constituted "unreasonable deadly force." *Id.* Because there was a genuine dispute about what exactly the car was doing, the *Ludwig* court could not "conclude that [the officer] is entitled to summary judgment based on qualified immunity for his attempt to hit Ludwig with a squad car." *Id.*

The *Ludwig* court's statement that "an attempt to hit an individual with a moving squad car is an attempt to apprehend by use of deadly force" certainly reads like a conclusion of law. But the court's reason for denying qualified immunity suggests that the question of whether the instrument of the force was used in a way that could be considered deadly force is a fact issue for the jury. The present case more closely mirrors the Eighth Circuit's analysis in *Ludwig*, because *how* the beanbag shotgun was used determines whether Officer Vanden Avond's firing of the shot at Mr. Anderson constituted the use of deadly force. And, as with *Ludwig*, significant factual disputes impact the determination of whether the use of force that occurred here created a substantial risk of causing death or serious bodily harm and was not an unforeseeable

aberration. Before turning to those disputed facts, the Court examines a few other informative cases.[6]

The Eleventh Circuit has twice concluded that the use of a beanbag projectile constituted deadly force. *See Knight v. Forsyth Cnty., Ga.*, 523 F. App'x 599 (11th Cir. 2013) (per curiam); *Mercado v. City of Orlando*, 407 F.3d 1152, 1160–61 (11th Cir. 2005). In *Mercado*, officers responded to a call that the plaintiff had a knife and had threatened to take his own life. *Id.* at 1154. The plaintiff was shot in the head from approximately six feet away with a beanbag launcher, causing traumatic brain injuries. *Id.* at 1155. Focusing closely on the summary judgment record, including the relevant departmental policies about aiming the beanbag launcher at sensitive areas and the evidence of the beanbag launcher's ability to cause death or serious harm, the *Mercado* court determined that the officer's actions constituted an unreasonable use of deadly force. *Id.* at 1160–61. The *Knight* court, relying on *Mercado*, found that an officer who shot a 67-year-old suspect

---

[6] Recently, the Eighth Circuit reversed the dismissal of a complaint where the plaintiff alleged he was shot with a ballistic beanbag in the eye from 20 feet away. *Mitchell v. Kirchmeier*, 28 F.4th 888, 898–99 (8th Cir. 2022). The *Mitchell* court concluded that the officer was not entitled to qualified immunity at the motion-to-dismiss stage because existing law clearly established that shooting an individual who was "neither committing a serious crime nor threatening anyone's safety nor fleeing or resisting arrest" with a shotgun loaded with a lead-filled bean bag was excessive force. *Id.* The *Mitchell* court did not address whether the officer's use of the beanbag shotgun under the circumstances constituted deadly force. Nor does the use of "deadly" or "lethal" force appear to have been a focus of the district court's decision. *Mitchell v. Kirchmeier*, Civil No. 1:19-cv-149, 2020 WL 8073625 (D.N.D. Dec. 10, 2020).

with a beanbag gun from three feet away was not entitled to qualified immunity where the suspect posed no immediate threat to the officer "that would have justified the use of deadly force against him." 523 F. App'x at 600. The district court in *Knight* evaluated the record evidence in assessing whether the officer's firing of the beanbag constituted excessive force. *Knight v. Finley*, No. 1:09-cv-1790-AT, 2012 WL 12895851, at *9 (N.D. Ga. May 14, 2012) ("All evidence available to the Court in the record indicates that shooting an elderly person in the upper chest with a super sock bean bag constitutes lethal force, particularly where this shooting occurs at a relatively close range."), *aff'd in part, rev'd in part and remanded sub nom. Knight*, 523 F. App'x 599.

The Seventh Circuit discussed the use of a beanbag projectile in the context of an alleged use of deadly force by law enforcement officers in *Omdahl v. Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999). Like *Mercado*, the officers in *Omdahl* responded to a call indicating that the plaintiff had threatened suicide, and the officers used beanbag rounds to attempt to subdue him. *Id.* at 731–32. In determining that it lacked jurisdiction over the officers' interlocutory appeal from the denial of their motion for summary judgment, the *Omdahl* court reasoned that the classification of the use of the beanbag rounds as deadly force presented a question of fact that affected both the issue of whether there had been a constitutional violation and whether the defendant officers were entitled to qualified immunity. *Id.* at 733–34 ("Lindholm and Stoffel ask this Court to reverse the district court's denial of their motion for summary judgment with regard to their defense of

qualified immunity. Reaching such a conclusion would require us to decide a material issue of fact—whether bean bag rounds constitute deadly force.").

Similarly, the court in *Smith v. City of El Paso, Texas*, No. EP-08-CV-147-DB, 2011 WL 13180179, at *7 (W.D. Tex. Oct. 13, 2011), treated the classification of the use of beanbag rounds as deadly force as a question of fact that turns on how they are use under the circumstances of a given case, ultimately concluding that the evidence did not support a finding of deadly force on the record presented. *Id.*

Broadly speaking, this survey of relevant authority teaches that whether an officer's use of force in a given set of circumstances amounts to deadly force is a fact-dependent inquiry that may not be susceptible to resolution on summary judgment.

### 2. Material Facts in Dispute

Here, two areas of factual disagreement exist that are critical to the analysis: the distance from which Officer Vanden Avond shot and where he aimed. The record shows that firing a beanbag round from a close range and firing such a projectile at certain very sensitive parts of the body can be deadly. As a result, Morrison County requires deadly-force authorization for such a deployment of the beanbag.

Start with the issue of how far Officer Vanden Avond was from Mr. Anderson when he shot. As discussed, Officer Vanden Avond argues that his use of force could not have been deadly force because he fired from a range that would not risk substantial injury or death. But Mr. Anderson has presented significant evidence—including the

dash camera footage, an aerial photograph, and expert testimony—that corroborates his estimate that Officer Vanden Avond fired from less than twenty feet. Even though Officer Vanden Avond provides evidence to corroborate his position of a greater distance, including the estimates of other officers, the Court is obligated to view the evidence in the light most favorable to Mr. Anderson. A reasonable juror looking at this evidence could certainly find that Officer Vanden Avond fired from a closer distance than the arguably minimum non-lethal distance, twenty feet. This presents, without a doubt, a meaningful and material factual dispute.

So too is there a dispute about where Officer Vanden Avond aimed the beanbag shotgun. A reasonable jury could find that he aimed for Mr. Anderson's chest, near his heart and other vital organs, which Morrison County training labels "Zone 3" and considers to be deadly force. Mr. Anderson argues that Officer Vanden Avond simply aimed where he was struck. *See, e.g., Moore*, 514 F.3d at 761–62 (assuming that the officer aimed at the target he struck, rather than the person the officer claimed he aimed at); *Mercado*, 407 F.3d at 1155, 1158 (holding that on summary judgment, the court must assume that the officer aimed for the head of the victim, despite the officer's deposition testimony that he aimed for the shoulder). Testimony indicating that Officer Vanden Avond's accuracy with the weapon is in the "upper level" for Morrison County deputies, and the shotgun used by the officer is a highly accurate weapon supports Mr. Anderson's position that the officer must have aimed at his chest.

Further, the inconsistent and vague testimony from Officer Vanden Avond regarding where he aimed would allow a reasonable juror to resolve this factual disagreement in Mr. Anderson's favor. In his deposition alone, Officer Vanden Avond claimed that he aimed at the "abdominal area," "solar plex," "diaphragm area," and "lower chest." His interview with the BCA indicated that he aimed at the "lower chest." A reasonable juror could find that Officer Vanden Avond aimed at what Morrison County categorizes as Zone 3, an area which Officer Vanden Avond knew required deadly-force authorization. Moreover, although Officer Vanden Avond asserts that Mr. Anderson moved during the shot, this defense is arguably contravened by the video footage in the record. The Court has watched the video, several times, and closely reviewed Mr. Anderson's body position when the shot was fired. Based on that video evidence, the Court cannot definitely state that he moved in such a way that flatly contradicts the assertion that the officer aimed at Mr. Anderon's chest.

Taking into account Mr. Anderson's grievous injury, resulting in near-fatal organ failure,[7] the contested firing distance, and the shot placement near vital organs, the Court finds that a genuine issue of material fact exists as to whether Officer Vanden Avond used force that created a substantial risk of causing death or serious bodily harm. Viewing

---

[7] The degree of injury is relevant in determining the amount of force used. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used.").

these facts in the light most favorable to the plaintiff leads this Court to conclude that a reasonable juror could find that Officer Vanden Avond used deadly force during his encounter with Mr. Anderson.

### 3.   Resolving the Deadly Force Issue

To decide whether Officer Vanden Avond would be entitled to qualified immunity on a claim that he exercised unreasonable deadly force requires the Court to determine whether his actions violated a clearly established right, such that a reasonable officer in his position would have known that his actions were unlawful. Courts must not define the right at issue too generally, and the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations omitted). It is important to define the right by reference to the circumstances with which the officer was confronted. *Id.* at 12–13. But "the right at issue should not be defined by reference to extraneous facts or circumstances that are not germane or important to evaluating the reasonableness of what the police officers did." *Est. of Devine v. Fusaro*, No. 3:14-CV-01019 (JAM), 2016 WL 183472, at *6 (D. Conn. Jan. 14, 2016), *aff'd sub nom. Est. of Devine*, 676 F. App'x 61 (2d Cir. 2017).

It is worth noting that Officer Vanden Avond does not argue that it was objectively reasonable to use deadly force under the circumstances of this case. Because Officer Vanden Avond put all his eggs in the not-a-deadly-force-case basket, he did not suggest how the Court might define the right at issue in his initial memorandum. Instead, for the

first time in his reply, Officer Vanden Avond argues that he is entitled to qualified immunity because it was not clearly established in May 2019 that the use of a beanbag gun in the manner at issue here constituted deadly force. [ECF No. 52 at 7–15]. Officer Vanden Avond does not point to a case that frames the qualified immunity inquiry in similar terms, nor does this framing identify the particular circumstances that confronted him with any specificity.

Here, viewed through the summary judgment lens, the relevant circumstances that confronted Officer Vanden Avond are these: Mr. Anderson was suspected of having committed a serious domestic violence offense, a felony; he was believed to be armed with a knife, but it was doubtful that he had a gun, even though he claimed to; he did not brandish a knife or a gun during his interaction with police; he was non-compliant with the officers' sometimes conflicting commands; at the time he was shot, he was hanging out of the vehicle's window; and though he reached back into the car several times while his torso was exposed, for roughly nine seconds before he was shot he did not reach into the car, move toward the officer, produce a weapon, or otherwise threaten the officers on the scene. *See Tolan*, 572 U.S. at 657 (stating that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions"). Therefore, the question becomes: faced with those circumstances on May 22, 2019, did the state of the law place it beyond debate to a reasonable officer that it would violate the

Constitution to fire a beanbag shotgun at a suspect in a manner that could constitute deadly force?

The answer to that question appears to depend on the resolution of a dispute over facts that would affect the outcome of the suit. *Creighton v. Anderson*, 922 F.2d 443, 447 (8th Cir. 1990) ("[I]f there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment.") (citations omitted). Because granting Officer Vanden Avond's qualified immunity defense regarding the issue of deadly force would require the Court to resolve disputed issues of fact in his favor, the Court finds it improper to resolve this question on summary judgment. Moreover, as explained below, even when assessing the objective reasonableness of Officer Vanden Avond's conduct without resolving whether his actions amounted to deadly force, the Court concludes that there are genuine issues of material fact precluding summary judgment in Officer Vanden Avond's favor.

**D. Excessive Force and Qualified Immunity**

### 1. Was the Force Used Unreasonable?

Determining "whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The constitutionality of an officer's actions is assessed from the perspective of

a reasonable officer at the scene. *Masters v. City of Indep., Missouri*, 998 F.3d 827, 835 (8th Cir. 2021) (internal quotations omitted). The Court examines the "information possessed by the officials" at the time of the seizure, but "[t]his does not mean reopening an inquiry into the official's subjective intent." *Gainor v. Rogers*, 973 F.2d 1379, 1384 (8th Cir. 1992).

Under *Graham*, courts evaluate the reasonableness of force under the totality of the circumstances, considering factors such as "(1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of the officer or others, and (3) whether the suspect is actively resisting or attempting to evade arrest by flight." *Masters*, 998 F.3d at 835 (summarizing factors originally set out in *Graham,* 490 U.S. at 396). Other factors considered in the Eighth Circuit include whether there was a warning given before using the weapon, *Tatum v. Robinson*, 858 F.3d 544, 551 (8th Cir. 2017) (considering the presence or absence of a verbal warning in assessing the reasonableness of the use of pepper spray), and the extent of the plaintiff's injuries, *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 582 (8th Cir. 2009) (recognizing that the extent of injury is relevant in determining the reasonableness of the use of force). Because Officer Vanden Avond used, at the very least, a high degree of force, the government's interest in effectuating that force must be proportionally substantial.

The first *Graham* factor weighs in the Officer's favor, as there is no dispute that Mr. Anderson committed a serious crime. *See, e.g.*, *Recca v. Pignotti*, 456 F. Supp. 3d 1154, 1165 (D. Neb. 2020), *aff'd sub nom. Recca v. Omaha Police Dep't*, 859 F. App'x 3 (8th Cir.

2021) (naming attempted felony assault a "serious crime"). Mr. Anderson was ultimately convicted of felony domestic assault for his actions against Ms. Doble earlier on the day in question. And Officer Vanden Avond was on the scene just after the assault, seeing Ms. Doble's injuries, hearing her account of the day's events, and giving him clear knowledge of this offense at the time of the incident.

The second factor—the threat posed by Mr. Anderson at the time of the shooting—is more complex. The Eighth Circuit has set a relatively low bar for what constitutes a threat justifying a response with high levels of force. *See, e.g.*, *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (finding the use of force justified where plaintiff was carrying a knife and "lift[ing] his foot as if to take a step in the general direction" of an officer, six to twelve feet away). However, the threat level presented by a suspect must be analyzed "*at the time*" the force is deployed. *Banks*, 999 F.3d at 525–26 (emphasis in original). "[A] few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force." *Cole Est.*, 959 F.3d at 1134.

Officer Vanden Avond has not pointed to evidence showing that Mr. Anderson posed a serious threat to the officers or others during the roughly nine seconds leading up to his use of force. In his deposition testimony, Officer Vanden Avond admitted that Mr. Anderson was, at that point, the most compliant with law enforcement that he had been throughout the entire encounter. [Vanden Avond Dep. at 140: 13–17]. He agreed

that Mr. Anderson "did not pose an immediate threat to the officers at that point in time."

Officer Ruby stated that Mr. Anderson "appeared to be in a nonthreatening position."

[Ruby Dep. at 59–60]. Officer Hegna acknowledged that when Mr. Anderson's hands

were visible, there was no immediate threat. [Hegna Dep. at 29–32]. The video footage

shows that for roughly nine seconds before Officer Vanden Avond fired, Mr. Anderson's

arms were continuously outstretched and visible. His hands were empty. He had ceased

making verbal threats. He made no movement inside the car—instead, he appeared to be

pushing his body farther out of it.

Officer Vanden Avond argues that Mr. Anderson still posed an immediate threat,

because "[i]n an instant, Anderson *could* have reached inside the vehicle, grabbed a gun

without the officers being able to see, and fired at them before they could react." [Reply

at 20 (emphasis added)]. To the Officer's point, the Court does not ignore the undisputed

evidence in the record that prior to the encounter, Mr. Anderson made threats to the

officers, and during the encounter he displayed erratic behavior, stated that he had a

weapon, and moved in and out of his vehicle. But it is also undisputed that he never

produced a firearm throughout the encounter, and both the officers and Ms. Doble

expressed doubts that he had one. A future hypothetical—plausible or not—is not a

justification for the use of significant force because a threat cannot be immediate when it

has not yet materialized. *See Tatum v. Robinson*, 858 F.3d 544, 548–49 (8th Cir. 2017) ("[A]

reasonable officer might have thought that Tatum's angry arguing could eventually

escalate to physical violence. But a reasonable officer would not think Tatum—who was angrily arguing but made no verbal threats or physical movements indicating a threat—posed an 'immediate' safety threat.").

A reasonable juror could conclude that the roughly nine seconds where Mr. Anderson held a surrendering position were sufficient for any pre-existing threat he posed to have been extinguished. *See Jackson v. Stair*, 944 F.3d 704, 712 (8th Cir. 2019) (finding that a threat could be extinguished in the time between two uses of a taser in quick succession). While it may be arguable that the use of some force was necessary to end the encounter before it escalated, the use of such a high degree of force was, "in a word, *excessive*." *Id.* at 713 (emphasis in original); *see also Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (finding that just because danger is not "entirely eliminated," does not mean that there is an immediate threat); *accord Deorle*, 272 F.3d at 1281. ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.").

Officer Vanden Avond was at a minimum a dozen feet away from Mr. Anderson. *See Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (considering the distance between the officer and the suspect when assessing the immediacy of a threat). Mr. Anderson was contained in his vehicle, had shown no weapons, and Officer Vanden Avond was surrounded by other officers armed with firearms. Before Officer Vanden Avond knelt to take the shot, Mr. Anderson's hands were up, empty, and in a

surrendering position. Taking the facts in the light most favorable to the plaintiff, Officer Vanden Avond did not have probable cause to believe that Mr. Anderson posed an immediate threat of serious physical harm.[8]

The third *Graham* factor similarly presents a significant factual dispute that, when viewed in the light most favorable to Mr. Anderson, does not show that he was actively resisting arrest at the time Officer Vanden Avond fired. "Noncompliance and arguing do not amount to active resistance." *Tatum*, 858 F.3d at 549. With the barrage of conflicting commands shouted at him from all sides, a reasonable juror could find that the intoxicated Mr. Anderson was following commands by keeping his hands up.[9] And

---

[8] Mr. Anderson argues that Officer Vanden Avond's failure to provide a warning before using deadly force makes his use of force even more clearly unreasonable. *See Cole Estate*, 959 F.3d at 1133–4 (finding that failure to warn before the use of deadly force "exacerbates the circumstances, further confirming that use of deadly force was objectively unreasonable[.]") "Where it is feasible, a police officer should give a warning that deadly force is going to be used." *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012). But since Officer Vanden Avond was within full view of Mr. Anderson, had repeatedly given him orders, and raised his beanbag gun towards him slowly, his conduct may have been a sufficient warning that the officer planned to use the weapon. *See id.* (determining that the plaintiff "should have been on notice" that the deadly force was about to be used as an officer slowly drew and raised his pistol). Even so, since Officer Vanden Avond had significant time to warn Mr. Anderson, a circumstance not present in *Estate of Morgan*, his failure to do so is among the circumstances which could support a jury finding that the use of force was unreasonable.

[9] The entire interaction between Mr. Anderson and the officers spanned less than two minutes, during which multiple officers shouted different, overlapping, and sometimes conflicting commands at Mr. Anderson. For example, officers repeatedly shouted for Mr. Anderson both to show his hands and open the car door, at the same time. Other commands included for him to get out of the car, open the car door, come out of the window, and keep his hands out the window.

ironically, pushing himself out of the window of his vehicle was the only way that Mr. Anderson could have both gotten out of the car and kept his hands visible, following both of these conflicting commands simultaneously.

The fact that Mr. Anderson had been previously noncompliant does not change this assessment. A reasonable officer is also able to ascertain and adapt to the changing conditions when effectuating an arrest. *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) ("[A] reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene."). In *Neal*, the suspect initially did not comply with a law enforcement officer's orders to stop and put his hands up and instead began walking away. He then changed his behavior and approached the officer with his hands up. The Officer then enacted an "arm bar takedown" against the suspect. The Court found that although the Officer's initial perception that the suspect was resisting was reasonable, when the suspect began to comply with orders, it was no longer reasonable to effectuate force. In this case, the facts read in favor of the plaintiff suggest that a reasonable officer would have seen Mr. Anderson change his behavior to take a surrendering position, and not have perceived him as resisting or threatening.

In sum, Officer Vanden Avond's description of Mr. Anderson as "armed, unstable, and noncompliant the whole time" is contradicted by the evidence in the record. [Def. Mem. at 21]. "Such an interpretation ignores our duty at the summary judgment stage to view the evidence in the light most favorable to . . . the nonmoving party." *Henderson v.*

32

*Munn*, 439 F.3d 497, 503 (8th Cir. 2006). The Court concludes that the facts taken through the appropriate summary-judgment lens would allow a reasonable juror to conclude that Officer Vanden Avond's use of force was objectively unreasonable. Thus, at this stage, Mr. Anderson has established the violation of a constitutional right.

### 2.   Was the Right Clearly Established?

Because Officer Vanden Avond asserts the defense of qualified immunity, the constitutionality of Officer Vanden Avond's actions is only half of the required analysis. To defeat qualified immunity, Mr. Anderson must also establish that the right in question—the right not to be subject to excessive force—was clearly established.

A right is clearly established if it is "sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Banks*, 999 F.3d at 528 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (cleaned up). As with the question of whether a right was violated, in assessing whether the right was clearly established, the facts of the current incident must be taken in the light most favorable to Mr. Anderson. *See Tolan*, 572 U.S. at 657 (instructing courts to "take care" not to "import[] genuinely disputed factual propositions" into the clearly established analysis).

A plaintiff can show that a right was clearly established in three ways: "He can (1) identify 'existing circuit precedent that involves sufficiently similar facts to squarely govern the officer's actions such that the officer had notice that his specific use of force was unlawful'; (2) 'present a robust consensus of cases of persuasive authority doing the

same'; or (3) 'demonstrate that a general constitutional rule applied with obvious clarity to the facts at issue.'" *Fuller v. Hafoka*, No. 19-CV-0886 (PJS/BRT), 2021 WL 3036907, at *9 (D. Minn. July 19, 2021) (quoting *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020)). Here, as outlined in greater detail above, the question is whether it was clearly established on May 22, 2019, that Officer Vanden Avond's shooting of a beanbag round at close range at the chest of a non-resistant and non-threatening suspected felon was unconstitutional excessive force. The Court concludes that it was—a reasonable officer would have known that this conduct was unlawful.

First, it was clearly established that the degree of force used against Mr. Anderson was very significant, even if it could arguably fall outside the boundaries of "deadly force." More than fifteen years of precedent, the officer's own training, and the specifications on the weapons themselves, caution that this weapon can cause serious injuries from close range and to certain areas of the body, and therefore its use requires substantial justification to be reasonable. *See, e.g.*, *Stockstell v. Dunbar*, No. 3:08-CV-00077-TJS, 2010 WL 1716150, at *1 (S.D. Iowa Feb. 25, 2010) (shot fired from six to eight feet away caused "a fractured knee, significant loss of muscle and flesh in her upper left thigh, and permanent disfigurement."); *Glenn v. City of Columbus, Ga.*, No. 4:07-CV-52 (CDL), 2008 WL 5115032, at *5 (M.D. Ga. Dec. 2, 2008), *rev'd in part*, 375 F. App'x 928 (11th Cir. 2010) (suspect died from beanbag shot to the chest and spleen from a distance of twenty feet); *Mercado*, 407 F.3d at 1155 (suspect suffered traumatic brain injury from a shot to the head

by a similar less-lethal weapon from a distance of six feet); *Deorle*, 272 F.3d at 1279 (shot

from thirty feet away "removed [plaintiff's] left eye and lodged pieces of lead shot in his

skull"). Even case law that does not label such uses of force as "deadly" is littered with

serious and life-threatening injuries suffered by individuals shot with the lead-filled bags.

*See, e.g.*, *Rauen v. City of Miami*, No. 06-21182-CIV, 2007 WL 686609, at *3 (S.D. Fla. Mar. 2,

2007) (shot to the head causing a serious injury).[10]

It is significant that Officer Vanden Avond was specifically trained on the Ninth

Circuit case *Deorle*, which found that firing a beanbag at a sensitive area is unlawful when

---

[10] *See also*, *Est. of Clayton Roy Zahn v. City of Kent*, No. C14-1065RSM, 2016 WL 29986, at *2 (W.D. Wash. Jan. 4, 2016) (shot to the stomach or abdomen leading to surgery, and years later, death); *Perkins v. Roberts*, No. CV 06-954-SU, 2010 WL 5866231, at *5 (D. Or. Oct. 12, 2010), *report and recommendation adopted in part*, No. 06-CV-954-SU, 2011 WL 719593 (D. Or. Feb. 23, 2011) (the beanbags "tore off [their] left testicle and caused serious bruising and cracked ribs"); *Cox v. Childers*, No. 06-CV-3197, 2008 WL 548175, at *2 (C.D. Ill. Feb. 26, 2008) (beanbag shot causing fractured left clavicle). Though decided after the use of force at issue in this case, more recent decisions similarly demonstrate the harmful potential of "less-than-lethal" projectiles. *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022) (eye socket shattered by beanbag fired from 20 feet away); *Myers v. Brewer*, 773 F. App'x 1032 (10th Cir. 2019) (suspect died from  beanbag round shot to the chest from a distance of six to eight feet); *Bun v. City of Livermore*, No. 17-CV-06418-EMC, 2022 WL 2833971, at *3 (N.D. Cal. July 20, 2022) (shot to the head from 30-40 feet away caused "a cracked skull and traumatic brain injury."); *Dundon v. Kirchmeier*, No. 1:16-CV-406, 2021 WL 6774678, at *12 (D.N.D. Dec. 29, 2021) (rubber bullets and  beanbags causing serious injuries, including "a woman who nearly lost her arm, a man who had a grand mal seizure, a woman shot in the eye, an elder who lost consciousness and was revived at the scene, a man with internal bleeding, a man shot in the back with less-lethal rounds near his spine, and multiple fractures").

no imminent threat exists. 272 F.3d at 1281.[11] In *Deorle*, the suspect was suicidal, verbally

threatening and brandished a hatchet at the police officers while attempting to goad them

into killing him. The officer shot him in the head with a beanbag round as the suspect

approached him. As the Ninth Circuit at the time used a stricter definition of deadly force,

the *Deorle* court concluded that the use of the "less-lethal" shotgun was not deadly force.

*Id.* at 1280. But the court found that the use of force was excessive, as the suspect did not

pose a threat of harm to the officers when the defendant fired the beanbag. *Id.* at 1284.

It was also clearly established in May 2019 that it was unreasonable for an officer

to use such a high degree of force against a suspect who was neither fleeing, nor posed

an immediate threat. It is beyond debate that when "a suspect is neither fleeing nor

resisting arrest and does not pose a threat to the safety of the officers, it is 'unreasonable

for [an officer] to use more than de minimis force against' the suspect." *Div. of Emp. Sec.,*

*Missouri v. Bd. of Police Commissioners*, 864 F.3d 974, 979 (8th Cir. 2017) (quoting *Small v.*

*McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013)); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 897

(8th Cir. 2014) (stating that "non-violent, non-fleeing subjects have a clearly established

right to be free from the use of tasers"); *see also Brown v. City of Golden Valley*, 574 F.3d 491,

---

[11] The training presentation included in the summary judgment record references the Ninth Circuit's initial opinion in *Deorle v. Rutherford*, 242 F.3d 1119 (9th Cir. 2001). ECF No. 46-14 at 31. The opinion was amended and superseded twice. *Deorle v. Rutherford*, 263 F.3d 1106 (9th Cir. 2001); *Deorle v. Rotherford*, 272 F.3d 1272 (9th Cir. 2001).

495 (8th Cir. 2009). This is true even when the plaintiff is suspected of committing a felony. *Div. of Emp. Sec.*, 864 F.3d at 979.

Existing Eighth Circuit precedent has also unequivocally prohibited the use of *non-lethal* weapons against a suspect who is not posing a serious threat to the officers, despite not complying with commands. In *Henderson v. Munn*, the court held that use of pepper spray and physical force on a suspect who was "no longer resisting arrest, even if he had resisted arrest before being subdued[.]" 439 F.3d at 503. The Eighth Circuit has explicitly held that it was clearly established in 2015 that "[a]mbiguous gestures that officers claim are noncompliant (such as reaching to extinguish a cigarette)" are not sufficient to justify non-lethal force such as "body slamming" where the suspect otherwise does not pose a threat or resist arrest. *MacKintrush v. Pulaski Cnty. Sheriff's Dep't*, 987 F.3d 767, 770–71 & n.2 (8th Cir. 2021) (citing *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018) and discussing its holding referencing clearly established law dating back to 2015). Under this precedent, a reasonable officer faced with the circumstances confronting Officer Vanden Avond would have known that firing a beanbag projectile, at close range and at sensitive region of the Mr. Anderon's body, was not proportional to the threat before him.

Viewing the facts in the light most favorable to the plaintiff, the Court finds that it was clearly established that Officer Vanden Avond's use of force against Mr. Anderson was objectively unreasonable, and therefore, excessive. Accordingly, granting the

Officer's motion for summary judgment based on his qualified immunity defense is inappropriate.

**III.    Conclusion**

Questions of fact preclude the entry of summary judgment here. Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 31] is **DENIED.**

Date: September 28, 2022

 *s/Katherine Menendez*
Katherine Menendez
United States District Judge