UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert A. Anderson, | Case No. 20-cv-1147 KMM/LIB |
| Plaintiff, | |
| vs. | |
| William Vanden Avond, | |
| Defendant. | |

**DEFENDANT'S TRIAL BRIEF**

### TRIAL

Jason M. Hiveley and Stephanie A. Angolkar will try this case to a jury on behalf of Defendant William Vanden Avond. The estimated time for trial is five days. Their contact information is in the signature block and below:

| | |
|---|---|
| Jason M. Hiveley | Stephanie A. Angolkar |
| Iverson Reuvers | Iverson Reuvers |
| 9321 Ensign Avenue South | 9321 Ensign Avenue South |
| Bloomington, MN 55438 | Bloomington, MN 55438 |
| Direct: (952) 548-7209 | Direct: (952) 548-7216 |
| Fax: (952) 548-7210 | Fax: (952) 548-7210 |
| jasonh@iversonlaw.com | stephanie@iversonlaw.com |

## **JURISDICTION**

The district court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

## **FACTS INTENDED TO BE PROVEN AT TRIAL**

On May 22, 2019, Morrison County Sheriff's Office received a report of domestic assault by Plaintiff Robert Anderson against his girlfriend, Jenna Doble, near Genola, Minnesota.

Morrison County Deputy William Vanden Avond responded and met Doble near her home. She was sobbing and still on the phone with dispatch. She had large lumps and bruises on the right side of her face. Vanden Avond asked dispatch to send an ambulance.

Doble reported her boyfriend, Robert Anderson "did it again, he did it again, he beat the shit out of me." Vanden Avond asked if she was hurt anywhere besides her face. She reported Anderson threatened to kill her and held a knife to her throat. Vanden Avond photographed Doble's neck and injuries. Doble also gave Vanden Avond a description of Anderson's vehicle.

Doble told Vanden Avond that Anderson would not go back to prison, was drunk and suicidal, and fled with the knife he had held to her throat. Anderson also sent texts to Doble reflecting the same, which she shared with Vanden Avond.

Vanden Avond relayed this information over the radio. After Anderson called Doble numerous times, Doble agreed to answer the phone when Anderson called again while Vanden Avond was present, and she recorded the phone call. When he did, Doble repeatedly asked where he was. Anderson responded he was in a swamp someplace, that he did not like cops, was not going to prison, and that Doble would attend his funeral tomorrow. He continued: "Jenna! Our kids are gonna grow up without a father because I'm gonna be dead tomorrow. By this time tomorrow, I'm gonna be dead."

Vanden Avond stepped in and identified himself from the Sheriff's Office. Anderson answered, "Yeah, F**k you! Come get me b****! You know what? I got something for ya. I got a gun and I got a knife." Vanden Avond asked where Anderson was and explained they needed to get his side of the story. Anderson answered, "Nope, ah, f**k you. Come get me b****. It's on! …Life or death b****! … I'm not goin' back. I'm not goin' back to prison. I'm not goin' to prison!" Anderson threatened Vanden Avond a second time: "Come strapped because I'm f***ing strapped too! I got a gun! Ah I have a gun … I got a gun and I got a knife." When Vanden Avond told Anderson he was calling his bluff, Anderson repeatedly said, "Call my bluff!" Finally, Anderson told Vanden Avond he was stuck in a swamp but did not know where. "Alls I know is that I'm ready for ya." Shortly after, Anderson hung up.

3

Vanden Avond then radioed that Anderson was stuck in a swamp and said he had a gun and would not go back to prison. Vanden Avond asked Doble if Anderson had a gun. She knew he had the knife and was a felon,[1] but did not know him to have a gun. Vanden Avond relayed this information over the radio as well.

**The Search and Approach**

During this time, several officers from Little Falls and Pierz searched for Anderson. After the paramedics arrived for Doble, Vanden Avond learned the officers had located fresh tire tracks in a field near the intersection of 210th Avenue and 133rd Street. Vanden Avond left Doble with the paramedics to join the search.

Vanden Avond arrived at the field where the tire tracks went into the dirt, got out of his squad car, and followed the tracks up a small incline on foot. There, Vanden Avond spotted Anderson's vehicle in a marshy area of the field. However, he could not see if anyone was in the vehicle. Four law-enforcement officers, including Morrison County Sheriff Shawn Larsen, Little Falls police Sergeant John Ruby, Morrison County Sheriff Sergeant Doug Rekstad, and Little Falls police officer Eric Hegna were also present. Meanwhile, Pierz police officer Calvin

---

[1] Anderson has previous convictions for second degree burglary, aggravated robbery (at gunpoint), receiving stolen property (felony) and second-, third-, and fourth-degree assaults. He also had convictions for domestic assault (felony) and for violation of a DANCO (felony). He was also convicted of carrying a gun without a permit. *Id.*

Tschida, Minnesota State Patrol trooper Matt Anderson, Morrison County Sheriff Deputy Mark Dzieweczynski, and DNR Conservation Officers Annette Kyllo and Keith Bertram were at the scene some distance away from the others.

The officers planned an approach to apprehend Anderson and discover if he was still in the vehicle or had fled. Vanden Avond suggested: "We can roll up with my squad, use my squad as cover, and get close to the vehicle, and at least, gain that ground, and if this is clear, then we can start working on the swamp area."

Prior to the approach, Vanden Avond unlocked the less-lethal shotgun because he did not want deadly force to be the only option the officers had. Sheriff Larsen also said he wanted the less-lethal gun available as an alternative to deadly force. Sergeant Rekstad began to slowly drive Vanden Avond's squad car over the hill toward Anderson's vehicle. Using the squad car's doors as cover, Vanden Avond, Ruby, Hegna, and Larsen approached on foot simultaneously with weapons ready. Meanwhile, two other officers approached from the left, while two more watched from a distant field to ensure Anderson did not escape across the road. As they reached the top of the hill, they stopped momentarily and observed the vehicle sitting in water but still could not tell if anyone was inside.

**The Deployment**

As the officers approached on foot, Anderson popped up from inside the vehicle, and an officer shouted: "Somebody's in there!" Immediately, the officers commanded Anderson to show his hands and get out of the car. The officers continued to command him to open the door and keep his hands up and out of the window as they approached. Five officers slowly moved toward the vehicle with their weapons trained on Anderson. After pausing at the edge of the dirt, the officers continued their approach into the grass, taking small tactical steps.

During this time, Anderson wildly moved his hands about and his upper body in and out of the driver's window, sometimes exposing his body from the waist up. On multiple occasions, he disappeared into the vehicle where his hands could not be seen before suddenly popping back up again—once with a phone, and once with a cigarette. It also appeared he was reaching for the glove compartment area.

Rather than follow commands, Anderson said: "I'm grabbing a cigarette." When Vanden Avond said, "Open the door, Robert, you can have your cigarette out here," Anderson replied, "No, you won't let me have it!" The officers assured him he could, but Anderson said, "No you won't." When told to open the door, Anderson threatened, "No, I have a gun." Vanden Avond repeated the command, and again, Anderson said, "I have a gun" and continued to ignore commands.

Turning to his left, Vanden Avond told Sergeant Ruby he would tag Anderson with the less-lethal shotgun if he got out farther. Vanden Avond relayed the same warning to the officers on his right, to ensure officers did not fire their lethal weapons. Sheriff Larsen agreed and added Vanden Avond should shoot Anderson's back if exposed.

Meanwhile, Anderson continued to ignore commands and yelled "No!" when Vanden Avond ordered him to get out of the car. In total, Anderson ignored commands for two full minutes, while threatening officers he had a gun, and making erratic movements. As Anderson leaned out the window again and exposed his upper body down to his belly button, Vanden Avond took two small steps, knelt down, got a good sight picture, and fired the less-lethal shotgun at Anderson's abdomen. However, the beanbag penetrated Anderson's chest as Anderson moved, which caused him to groan and slump back into the vehicle. Vanden Avond was shocked when he saw Anderson's bloodied shirt and that the beanbag had not bounced off his body.

Anderson immediately pumped the less-lethal shotgun which ejected the spent shell casing onto the ground next to him and loaded a new less-lethal shell into the shotgun, and then the officers closed in and extracted Anderson from the vehicle and set him on the ground. After Vanden Avond lifted Anderson's shirt and saw a bleeding hole in his chest, he immediately began life saving efforts.

Vanden Avond kept his gloved hand over the wound, asked for a defibrillator, and encouraged Anderson to stay with them and to continue breathing. They loaded Anderson onto an ambulance backboard and into a truck, which transported him across the field to the ambulance.

Anderson survived his injuries and would later be convicted of felony domestic assault for his violent attack of Doble.

**Distance of Deployment**

Ballistics expert Michael Shain reviewed the scene and incident and determined the deployment occurred at a distance between 24 and 27.5 feet away. This is consistent with training on proper distances.

## CLAIMS AND DEFENSES

Anderson originally asserted a 42 U.S.C. § 1983 excessive force claim under the Fourth and Fourteenth Amendments against Vanden Avond and a failure to train claim under *City of Canton v. Harris* against Morrison County. *Doc. 1.* Anderson dismissed his claim against Morrison County on February 9, 2022. *Doc. 51.* The district court denied Defendant's Motion for Summary Judgment on September 28, 2022, determining whether Deputy Vanden Avond is entitled to qualified immunity or liable to Anderson requires resolving several disputed facts. *Doc. 58, pp. 21-38.*

All that remains is Anderson's claim against Deputy Vanden Avond for excessive force. Claims that a police officer used excessive force in the course of making an arrest are properly analyzed under the Fourth Amendment's objective reasonableness standard. *Westwater v. Church*, 60 F.4th 1124, 1128 (8th Cir. 2023) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). While the issue of whether an official was acting under color of law is an element for consideration of § 1983 claims, there is no dispute Deputy Vanden Avond was acting under color of state law.

Determining reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The reasonableness of an officer's use of force must be examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. This allows "for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

While "police officers undoubtedly have a right to use some degree of physical force," the force used must be reasonable. *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (citation omitted). Reasonableness is determined objectively

based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009). Other factors to consider are 1) the need to use force; 2) the relationship between the need to use force and the amount of force used; 3) whether defendant reasonably believed there was threat to safety; and 4) efforts made by defendants to limit the amount of force used. *Graham*, 490 U.S. at 397. While the extent of injury is also relevant, it is not the "core judicial inquiry." *Green v. Missouri*, 734 F. Supp. 2d 814, 838 (E.D. Mo. 2010), *aff'd sub nom. Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37, 39 (2010)).

The use of force at issue is the use of a less-lethal beanbag round. The Ninth Circuit has recognized "a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end." *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001) The Eighth Circuit has held the use of a less-lethal beanbag round was objectively reasonable when a woman held a knife to her own throat and refused to drop the knife. *Brown v. City of Bloomington*, 280 F. Supp. 2d 889, 891 (D. Minn. 2003). The Ninth Circuit similarly affirmed the use of a beanbag round when a suspect had threatened a young girl and her mother with a chainsaw, yet did not have the chainsaw when officers arrived, as the suspect put

his hands down to his belly when ordered to keep them up. *Rivas-Villegas v. Cortesluna v. Leon*, 979 F.3d 645, 652-53 (9th Cir. 2020).

Anderson will likely assert there are additional preconditions to consider because he claims Vanden Avond aimed for a zone which required deadly force authorization. However, there is no "magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott v. Harris*, 550 U.S. 372, 382 (2007). Rather, in all excessive-force cases, whether involving the use of deadly force or otherwise, the constitutional question is ultimately judged by the standard of objective reasonableness. *Id.*

## UNRESOLVED ISSUES

**Substantive Issues:**

Qualified immunity remains at issue. The Court determined viewing the facts in the light most favorable to Anderson, it was clearly established Vanden Avond's use of force against Anderson was objectively unreasonable and therefore denied the Motion for Summary Judgment. *Doc. 58 p. 37.* Factors relevant to the Court's analysis included the distance and aim of Vanden Avond's deployment of the beanbag, as well as whether Anderson was fleeing, resisting arrest, or posed a threat to the safety of the officers. *Id. at pp. 34-37* (citing *Div. of Emp. Sec., Missouri v. Bd. of Police Commissioners*, 864 F.3d 974, 979 (8th Cir. 2017)).

Qualified immunity provides officials breathing room to make reasonable but mistaken judgments, "and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). In the event the jury finds Deputy Vanden Avond used excessive force, the district court must determine whether the right was clearly established and if Deputy Vanden Avond is entitled to qualified immunity as a matter of law.

As set forth in Vanden Avond's proposed special verdict form, factual findings of the jury may aid the Court's determination on qualified immunity. The use of factual findings to assist the Court has been utilized in other excessive force cases in this District. *Decker v. McNamara*, No. 20-cv-1536 (PJS/JFD) (Doc. 76); *Coequyt v. Holien, et al.*, 20-cv-1178 (PJS/TNL) (Doc. 131); *Jones v. Dahlson*, No. 11-cv-0289 (PJS/FLN) (Doc. 69).

These questions include, "Given all of the circumstances known to Deputy Vanden Avond at the time, could a reasonable officer in Deputy Vanden Avond's position – without the benefit of hindsight – have concluded that:

1. Deputy Vanden Avond fired the beanbag round from 20 or more feet away from Robert Anderson?

2. Deputy Vanden Avond aimed for Robert Anderson's abdomen when firing the beanbag round?

12

3. Robert Anderson posed a safety risk to Deputy Vanden Avond, himself, and/or others?

4. Robert Anderson posed an immediate threat to the safety of Deputy Vanden Avond, himself, and/or others?

5. Firing the beanbag round did not create a substantial risk of causing death or substantial bodily harm?

6. Robert Anderson was actively resisting the officers and disobeying their commands at the time he fired the beanbag round?

7. The officers' repeated commands and the fact that Deputy Vanden Avond knelt down and slowly raised the beanbag gun towards Robert Anderson in plain sight provided a warning to Robert Anderson that Deputy Vanden Avond planned to use the weapon?

**Evidentiary Issues:** As set forth in the motions in limine briefing, Vanden Avond asks the Court to make the following evidentiary determinations:

1. Exclude viewing of video footage in slow motion, screen shots, or in any manner or format other than the actual speed and conditions under which the involved officer experienced the incident at the time.

2. Exclude testimony and argument regarding compliance with training, criticism of the County's investigation, and internal investigation.

3. Exclude, or alternatively, limit undisclosed expert testimony of Dr. Jon Gayken.

4. Exclude portions of Jack Ryan's expert testimony.

5. Security clearance for exemplar exhibits of beanbag and cartridge.

6. Exclude hearsay evidence in the form of BCA interviews.

7. Exclude arguments or comments regarding other events involving allegations of police misconduct.

**Procedural Issues:** If the Court grants the motion for introduction of the exemplar beanbag and cartridge, Vanden Avond requests the Court also provide notice to Court Security Officers for security clearance since the exemplar is ammunition.

| | |
|---|---|
| Dated: July 10, 2023 | s/Stephanie A. Angolkar<br>Jason M. Hiveley, #311546<br>Stephanie A. Angolkar, #388336<br>Aaron M. Bostrom, #401773<br>IVERSON REUVERS<br>9321 Ensign Avenue South<br>Bloomington, MN  55438<br>(952) 548-7200<br>jasonh@iversonlaw.com<br>stephanie@iversonlaw.com<br>aaron@iversonlaw.com<br><br>*Attorneys for Defendants* |