UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert A. Anderson,<br><br>                Plaintiff,<br>v.<br><br>William Vanden Avond, acting in his individual capacity as a Morrison County Sheriff's Deputy,<br><br>                Defendant. | Civ. No. 20-1147 (KMM/LIB)<br><br>**PLAINTIFF'S TRIAL BRIEF** |

**A.      Trial Counsel for Plaintiff**
Andrew J. Noel
Marc E. Betinsky
800 Lasalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
Fax: 612-339-4181
E-mail: anoel@robinskaplan.com, mbetinsky@robinskaplan.com

**B.      Jury/non-jury**

This case is to be tried to a jury.

**C.      Trial length**

Plaintiff anticipates that this trial will last 6-7 days, including jury selection and jury charge.

**D.      Jurisdiction**

This action is for money damages for injuries sustained by Plaintiff Robert Anderson as a result of the use of excessive force and violation of his Fourth Amendment rights by Defendant William Vanden Avond. At all times material hereto, Plaintiff was a citizen of the United States and a resident of the State of Minnesota; Defendant was a citizen of the United States and a resident of the State of Minnesota; and Defendant was acting as a duly appointed deputy of the Morrison County Sheriff's Office. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United

States Constitution, and 28 U.S.C. §§ 1331 and 1343(a), which confer original jurisdiction of this Court over this matter.

E.     Facts:

On May 22, 2019, Jenna Doble, Robert's ex-girlfriend and the mother of his two children, called 911 to report that Robert had assaulted her. Defendant Vanden Avond responded to Doble's location in Genola, a small town approximately 10 miles east of Little Falls. Doble informed Vanden Avond that Robert was drunk and suicidal, had assaulted her, and then fled in a tan Buick, taking a knife with him. Vanden Avond radioed that information to other officers, who began to search for Robert's vehicle. At Vanden Avond's request, Doble called Robert on speakerphone, to see if he would reveal his location. Vanden Avond could tell right away that Robert was drunk. Robert told Doble he was stuck in a swamp, did not know where he was, was suicidal and would be dead by tomorrow. Vanden Avond then identified himself and Robert responded with an expletive, said he had a knife and a gun, and challenged Vanden Avond to come find him. The call then disconnected. Vanden Avond asked Doble if she knew Robert to have a gun and she told him that she had never seen Robert with one. Vanden Avond radioed, "She honestly doesn't think he does [have a gun]. She thinks he's just talking. But for sure should have a knife." Vanden Avond then joined the search for Robert.

Pierz police officer Calvin Tschida eventually spotted a fresh set of tire tracks in a plowed field in a rural area between Genola and Little Falls. Following the tracks, he observed a car stuck in a low, swampy spot. Believing this to be Anderson's vehicle, he radioed for assistance and numerous officers descended on the area, including Vanden Avond, Morrison County Sheriff Shawn Larsen, Morrison County deputy Sergeant Doug Rekstad, and Little Falls officers Sergeant John Ruby and Eric Hegna. Morrison County deputy Mark Dzieweczynski, State Patrol trooper Matt Anderson, and DNR officers Annette Kyllo and Keith Bertram also responded. Vanden Avond carried that day a "less-lethal" 12-gauge shotgun loaded with beanbag rounds, cloth projectiles filled with lead shot, that he had been issued only a few months earlier. In training, Vanden Avond was an accurate shooter, and he admitted the weapon itself is accurate.

The officers could not tell if Anderson was still inside the vehicle, and they spent nearly 16 minutes discussing several ways to find out, including bringing in a drone, a police dog, or an armored vehicle. Ultimately five officers – Vanden Avond, Larsen, Rekstad, Ruby, and Hegna – decided to slowly approach on foot using Vanden Avond's squad car doors for cover; Tschida, Anderson, Kyllo and Bertram were sent further away to provide cover from a distance. Closing in on a dirt/grass line in their slow approach, the five officers eventually saw Robert in the

vehicle's driver seat. They began barking inconsistent commands at him to both show his hands and exit the vehicle. Robert did not immediately comply.
The officers then made the decision to abandon the squad car and approach the vehicle on foot into the grass, forming a "tactical L." Larsen, Ruby and Hegna trained rifles on Robert, while Vanden Avond pointed his "less-lethal" shotgun at him; Rekstad stood behind others with his pistol. Over the ensuing minute, Robert at times extended his hands, arms, and/or upper body out of the vehicle's open driver window; he also said he wanted a cigarette. Though he mentioned having a gun, he never brandished one; when objects were in his hands out the window, they were immediately recognized as non-threatening (cell phone, lighter, cigarette). Robert did not exit the vehicle.

59 seconds after beginning their approach, Vanden Avond told the other officers that he would shoot Robert with the "less-lethal" shotgun if he came out of the vehicle farther. He did not warn Robert that he planned to shoot. Nor did he or any of the other officers ever tell Robert that he was under arrest. Vanden Avond approached further into the grass and took a shooting position on one knee. For nine seconds, Robert's upper torso extended out the driver window, with his arms to the sides and his hands visibly empty. He posed no imminent threat in that position and was the most compliant he had been with officer commands during those nine seconds. His car was stuck and he was at no risk of escaping, surrounded by officers in a swamp. Nevertheless, Vanden Avond chose to fire. The round struck Robert in the middle of his chest – an area Vanden Avond knew by training was in Zone 3, requiring deadly-force authorization to shoot – and he fell back into the vehicle.

The officers rushed the car and found Robert unconscious, bleeding from a hole in his chest. While a knife was inside, there was no gun in the vehicle. They dragged Robert into the grassy field and began life-saving efforts, ultimately involving an ambulance ride and two helicopter rides to Hennepin County Medical Center because of Robert's critical condition. An intact, blood-soaked beanbag was later removed from Robert's posterior lung. Robert suffered severe injuries from the shooting and spent more than nine days in the hospital. Miraculously, he survived, but he continues to experience pain, numbness, and tingling in his chest and side to this day.

Vanden Avond lied repeatedly about the shooting in its aftermath. On scene, he told the other officers that he fired from the dirt/grass line, despite having fired from substantially closer to Robert's car. When Morrison County Chief Deputy Jason Worlie found Vanden Avond's spent shell casing significantly forward of his claimed firing position, Vanden Avond lied and claimed he walked towards the car before racking the shotgun. When discussing the shooting with other officers, Vanden Avond intentionally turned off the microphone on his squad-car-connected radio, which was recording what he was saying, but later claimed that

the battery died. And, Vanden Avond claimed he never measured the distance from the spent shell casing to the car, despite being captured on drone video doing exactly that. Other officers with the Morrison County Sheriff's Office also took steps to ensure Vanden Avond would not be held accountable for his actions.

The Minnesota Bureau of Criminal Apprehension (BCA) later investigated the shooting. It found the shotgun in good working order. It was later returned to Vanden Avond, who confirmed it was still accurate.

F.   **Plaintiff's Claims**

Robert claims that Vanden Avond, under color of state law, violated and deprived him of his clearly established and well-settled right to be free from the use of excessive force. Vanden Avond subjected Robert to this deprivation of rights either maliciously or acting with reckless disregard for whether his rights would be violated by their actions. Vanden Avond claims his actions were reasonable under the circumstances.

The determination of whether force used by an officer is reasonable under the Fourth Amendment requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The question for the jury is whether, judging from the perspective of a reasonable officer, the totality of the circumstances justifies the force used. *Id.* There is no precise definition for, or mechanical application of, the "reasonableness" test, but salient factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Whether alternative means were available to the officers and the extent of the injuries inflicted also are relevant considerations. *Shelton v. Stevens*, 964 F.3d 747, 753 (8th Cir. 2020); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).

Vanden Avond used deadly force against Robert by shooting him in the chest at a moment when deadly force – per the agreement of every defense witness in this case, including Vanden Avond himself – was not justified. He has offered varying defenses for his actions, including that Robert moved between the shot and the impact – a physical near impossibility considering how quickly the projectile traveled, let alone something that is not reflected on video. He has also claimed that he aimed the shotgun lower on Robert's body, in target Zone 2, despite telling the BCA he aimed at Robert's chest, which is in Zone 3. More importantly, where Vanden Avond supposedly aimed is a question of his subjective intent that does not inform the unlawfulness of his actions. What matters is where Robert was struck, not where Vanden Avond claims he was *trying* to strike. *Marks v. Bauer,* Case No. 20-cv-1913 (ADM/DLM), Memorandum Opinion and Order (Dkt. No.

4

148), at 14-15 (D. Minn. Feb. 2, 2023); *Bond v. United States,* 529 U.S. 334, 338 n.2 (2000); *Graham,* 490 U.S. at 397; *Dancy v. McGinley,* 843 F.3d 93, 115-18 (2d Cir. 2016); *Wilson v. City of Lafayette,* 510 F. App'x 775, 780 (10th Cir. 2013). This is why it is a deadly-force case, because Robert had deadly force *applied* to him; it does not matter whether Vanden Avond was *trying* to use deadly force *vel non*. Regardless, even if the use of force were considered non-deadly, it was still excessive given that Robert was not a flight risk and was not an imminent threat at the time Vanden Avond fired.

In addition to seeking compensatory damages for his injuries, Robert seeks punitive damages under *Smith v. Wade*, 461 U.S. 30 (1983). A jury may assess punitive damages in a § 1983 action when the defendant's conduct involved reckless or callous indifference to the plaintiff's federally protected rights, as well as when it was motivated by evil motive or intent. *Id.* at 51.

### G. Unresolved Issues

    i. Whether Vanden Avond violated and deprived Robert of his clearly established and well-settled right to be free from the use of excessive force.
        a. By shooting Robert in the chest, Vanden Avond used excessive force (whether considered deadly or not) in violation of the Fourth Amendment, causing Robert significant injuries.
        b. Authority: *Graham v. Connor*, 490 U.S. 386 (1989); *Banks v. Hawkins*, 999 F.3d 521 (8th Cir. 2021); *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020); *Ellison v. Lesher*, 796 F.3d 910 (8th Cir. 2015); *Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995).

    ii. The availability of punitive damages against Vanden Avond.
        a. Robert's claim of punitive damages against Vanden Avond as a matter of federal common law is proper in this Section 1983 action.
        b. Authority: *Smith v. Wade*, 461 U.S. 30 (1983).

    iii. The admissibility of certain expert evidence.
        a. Vanden Avond's experts should not be permitted to testify that the shooting was reasonable or that they know where Vanden Avond was aimed or what Vanden Avond was thinking. They also must not be allowed to offer new opinions (or new bases for them) beyond their expert reports.
        b. Authority: Federal Rule of Civil Procedure 26(a)(2)(B), 26(e); Federal Rules of Evidence 403, 702, 703, 704.

    iv. The admissibility of certain "bad act" evidence.
        a. The following "bad act" evidence, as described more fully in Robert's motion in limine, should be excluded: (1) portions of Robert's prior criminal history and incarcerations; and (2) evidence concerning jail misconduct.
        b. Authority: Federal Rules of Evidence 402, 403, 404, 608, 609.

    v. The admissibility of evidence regarding the effect of this case on Vanden Avond.
        a. The Court should exclude evidence or argument offered by Defendant that this case may disparately affect his career or finances, or trouble him personally.
        b. Authority: Federal Rules of Evidence 401, 402, 403.

    vi. The admissibility of evidence from the website cars.com.
        a. The Court should exclude evidence or argument offered by Defendant from cars.com.
        b. Authority: Federal Rules of Evidence 401, 402, 403, 702, 703.

    vii. The admissibility of evidence that Vanden Avond fired to protect Robert from himself.
        a. The Court should exclude testimony or other evidence, including expert testimony, that Vanden Avond shot Robert to protect him from himself.
        b. Authority: Federal Rules of Evidence 401, 402, 403; *Partridge v. City of Benton*, 929 F.3d 562, 566-67 (8th Cir. 2019); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005).

    viii. The admissibility of evidence regarding future hypotheticals.
        a. The Court should exclude evidence or argument offered by Defendant that future possibilities or hypotheticals justified his use of force.
        b. Authority: Federal Rules of Evidence 401, 402, 403; Order on Motion for Summary Judgment (Dkt. No. 58).[1]

---

[1] Based on Federal Rules of Evidence 403 and 1002 and *United States v. Smith*, 635 F.2d 716, 719 (8th Cir. 1980), Robert initially planned to move *in limine* to exclude Defendant's proposed exhibit D-2, a transcript of a telephone recording between Robert and Doble on the day of the shooting. (The transcript is attached to the Declaration of Marc Betinsky as Exhibit C.) During the parties' meet-and-confer in connection with jury instructions, however, Defendant agreed to an instruction that the transcript is not substantive evidence to be received by the jury, thus impliedly conceding that the

|  | **ROBINS KAPLAN LLP** |
|---|---|
| Dated: July 10, 2023 | By: *s/Marc Betinsky* <br> Robert Bennett, #0006713 <br> Andrew J. Noel, #0322118 <br> Kathryn H. Bennett, #0392087 <br> Marc Betinsky, #0388414 <br> 800 LaSalle Avenue, Suite 2800 <br> Minneapolis, MN 55402 <br> 612-349-8500 <br> rbennett@robinskaplan.com <br> anoel@robinskaplan.com <br> kbennett@robinskaplan.com <br> mbetinsky@robinskaplan.com <br> *Attorneys for Plaintiff* |

---

transcript is not properly offered.  In order to avoid wasting the Court's time with a motion that is apparently moot, Robert accordingly has not moved to exclude proposed exhibit D-2.  In the event he has misread the tea leaves, however, Robert notes here his objection to this proposed exhibit.